# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**BARRY HENDERSON,**

     Plaintiff,

     v.

**TIFFANY WRIGHT, et al.,**

     Defendants.

CASE NO. 3:24 CV 2021

JUDGE JAMES R. KNEPP II

**MEMORANDUM OPINION AND ORDER**

### INTRODUCTION

Before the Court is Defendants' Motion to Dismiss (Doc. 7)[1] Plaintiff Barry Henderson's First Amended Complaint (Doc. 5) alleging Defendants Tiffany Wright and Allen Metropolitan Housing Authority ("AMHA") violated his constitutional and statutory rights. Plaintiff opposed (Doc. 11), but Defendants did not reply within the time allotted. Jurisdiction is proper pursuant to 28 U.S.C. § 1331. For the following reasons, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss.

Because Plaintiff may continue to prosecute Claims Two and Three against Wright in her individual capacity, Plaintiff's Motion to Disqualify Attorney Dalton Smith as counsel for

---

1. The Motion to Dismiss was brought on behalf of "Tiffany Wright, in both her official and individual capacity" rather than on behalf of Tiffany Wright in both capacities and the AMHA itself. (Doc. 7, at 1). Plaintiff filed suit against Wright in her official capacity and, as discussed further below, such an official capacity claim is "merely another name for a claim against the municipality." *Essex v. Cnty. of Livingston*, 518 F. App'x 351, 354 (6th Cir. 2013) (citing *Cady v. Arenac Cnty.*, 574 F.3d 334, 342 (6th Cir. 2009)). Thus, the Court analyzes the legal sufficiency of Plaintiff's claims as to all Defendants, including the AMHA, as the issue is fully briefed. *See I-Star Commc'ns Corp. v. City of E. Cleveland*, 885 F. Supp. 1035, 1042 (N.D. Ohio 1995).

Defendants (Doc. 13) and Defendants' opposition thereto (Doc. 15) are also properly before the Court. For the following reasons, the Court GRANTS IN PART Plaintiff's Motion to Disqualify.

BACKGROUND

Plaintiff's factual allegations, accepted as true for the purposes of Defendants' Motion to Dismiss, are recounted as follows. Plaintiff moved to the city of Lima, Ohio, sometime in 2014. (Doc. 5, at 3). Upon arrival, he promptly applied for federal housing assistance through AMHA pursuant to the Fair Housing Act of 1937. *Id.*; *see also* 42 U.S.C. § 1437d. Plaintiff waited roughly three years before being placed in public housing, during which time he lived at the local YMCA. (Doc. 5, at 3). From 2017 to 2022, Plaintiff resided without issue in a public housing apartment located at 936 W. Robb Ave., Apt. 313 Lima, OH 45801. *Id.* AMHA charged Plaintiff $25 per month in rent during this period. *Id.* at 5.

On October 31, 2022, Plaintiff lost his job and began receiving unemployment insurance compensation shortly thereafter. *Id.* at 3. Plaintiff submitted to AMHA a change of income form on November 18, 2022, to place AMHA on notice of his new source of income. *Id.* For months, AMHA did not respond to the notice in any way nor increase Plaintiff's rent. *Id.* In the middle of August 2023, Plaintiff began receiving Social Security payments. *Id.* Roughly a month later, on or about September 13, 2023, Plaintiff reported this second change in income to AMHA. *Id.*

On October 27, 2023, AMHA sent a letter to Plaintiff notifying him of retroactive rent owed because he began "receiving Social Security and Unemployment benefits and it was not reported to [AMHA] within 10 days of the change." (Doc. 5-3, at 1). Specifically, AMHA alleged Plaintiff: (1) began receiving Social Security payments in June 2023 rather than August 2023, (2) did not report the change in income until September 27, 2023, and (3) notified AMHA of the unemployment insurance payments in October 2023, not November 2022, despite beginning to

2

receive such payments in November 2022. *Id.* As a result, AMHA notified Plaintiff his proper rent calculation from December 2022 to July 2023 was $333 per month, a $308 increase from the $25 in rent Plaintiff actually paid. *Id.* From July 2023 through December 2023, when Plaintiff received both unemployment insurance payments and Social Security benefits, AMHA calculated his rent payment at $568 per month, a $543 increase from the prior $25 obligation. *Id.* In sum, AMHA alleged Plaintiff owed $4,871 in retroactive rent. *Id.* Further, AMHA required Plaintiff to pay $3,872 by November 27, 2023, just 31 days after the letter's date, to be eligible for a repayment plan for the remaining $999. *Id.* Failure to tender that amount would "result in an automatic lease termination." *Id.*

Following receipt of the letter, Plaintiff obtained the representation of Attorney Chelsea Kemper. *See* Doc. 5-4, at 1–2. Kemper took numerous steps to contact AMHA in an attempt to secure Plaintiff an informal conference and, if necessary, a formal grievance hearing to address AMHA's October 27 letter. *Id.* at 2. Specifically, Kemper mailed a written request to AMHA, left a voicemail with AMHA, left a voicemail with Betty Boyer, an employee of AMHA, emailed Dalton Smith, counsel for AMHA, and also left a voicemail with Smith. *Id.* The only response Kemper received was from Boyer, indicating Kemper should contact Smith regarding the October 27 letter. *Id.* Eventually, Kemper encountered Smith while at the Lima Municipal Court on November 29, 2023, for purposes unrelated to the matter now before the Court. *Id.* There, the attorneys discussed the October 27 letter. *Id.* After that discussion, Kemper understood no further action would be taken until the parties could schedule and hold an informal meeting to address the October 27 letter. *Id.*

Nevertheless, on November 30, 2023, AMHA issued a "30 day notice of termination and invitation to conference and notice to leave the premises" to Plaintiff. *See* Doc. 5-5. The grounds

asserted for the termination partially mirrored those alleged in the October 27 letter, as AMHA charged Plaintiff with "failing to report to AMHA [S]ocial [S]ecurity income [he was] receiving in a timely manner" and failing "to make a payment to bring [his] balance owed below $1000.00." *Id.* at 3. Notably missing from the notice of termination was a formal allegation that Plaintiff failed to report a change in income stemming from the receipt of unemployment insurance benefits. *See id.* Included in the notice, however, was a list of Plaintiff's rights associated with the termination process. First, the notice indicated Plaintiff was entitled to an "informal conference to make reply or explanation[.]" *Id.* at 1. AMHA scheduled the conference for December 19, 2023, at 2:30 p.m. and indicated Plaintiff could participate or reschedule by calling the AMHA's management office. *Id.*

On December 1, 2023, Kemper contacted Smith, asking when the two could discuss the November 30 notice of termination. (Doc. 5-4, at 3). Kemper did not call or otherwise contact the AMHA management office to reschedule the informal phone conference scheduled for December 19, 2023, according to the November 30 notice. *Id.* The pair exchanged multiple emails, but the scheduled December 19 informal phone conference did not occur, nor did any other informal conference or formal hearing around this time. *Id.* at 3–4. In "early January 2024," Plaintiff received a slight increase in Social Security benefits, which he reported to AMHA on or about January 5, 2024. *Id.* at 5.

Plaintiff next received two formal lease amendments dated February 22, 2024. (Docs. 5-6; 5-7). The first adjusted his monthly rent from $25 to $224 effective December 1, 2023, due to Plaintiff's initial receipt of Social Security benefits. (Doc. 5-6, at 1). The second further adjusted Plaintiff's rent payments from $224 to $232 effective February 1, 2024, presumably because of Plaintiff's second report of increased Social Security income. (Doc. 5-7, at 1). On March 1, 2024,

Kemper emailed a letter to Smith requesting an informal hearing specifically regarding the rent calculations contained in the lease amendments. (Doc. 5, at 6). Smith did not reply to this email. *Id.* Plaintiff proceeded to pay $232 to AMHA on March 5, 2024, representing the rent owed as of February 1, 2024. *Id.* On March 15, 2024, AMHA issued a second notice of termination to Plaintiff. (Doc. 5-8). This second notice alleged Plaintiff violated the terms of his lease by failing to pay base rent and resulting late fees. *Id.* at 5. AMHA claimed Plaintiff owed the original $4,871 stated in the first notice, as well as an additional $620 in rent adjustments for December, January, and February, and a late fee for March's rent payment. *Id.* at 1. The second notice set an informal telephone conference for April 16, 2024. *Id.*

After Plaintiff received this second notice of termination, Kemper emailed Smith to request an informal conference and, if necessary, a grievance hearing. (Doc. 5, at 6). A hearing was set for April 5, 2024, which Smith indicated would be a formal grievance hearing after allegedly Plaintiff failed to attend an unspecified prior informal conference. *Id.* at 6–7. Plaintiff, along with Kemper, attended the April 5 hearing. *Id.* at 7. At that hearing, and without prior notice to Plaintiff or Kemper, Smith, outside counsel for AMHA, served as the presiding hearing officer. *Id.* Following the hearing, AMHA issued a third notice of termination on April 15, 2024, alleging Plaintiff then owed a total of $5,738 in retroactive rent and late fees. (Doc. 5-9). On May 8, 2024, despite Smith's prior representations that the April 5 meeting was a formal grievance hearing, AMHA published what was labeled an "informal hearing opinion" authored by Smith. The opinion described Smith as the "Informal Hearing Officer" at the April 5 hearing. (Doc. 5-10, at 1, 8). This opinion affirmed the AMHA's decision to terminate Plaintiff's public housing assistance, but adjusted his retroactive rent obligation down from $4,871 to $2,078. *Id.* at 1, 3.

On May 13, 2024, Kemper called to reschedule the informal telephone conference according to the information and instructions included in the April 15 notice of termination. (Doc. 5, at 8). The parties did not reschedule the conference, and Kemper instead called AMHA on May 16, 2024, according to the original schedule set by the April 15 notice. *Id.* Kemper reached the voicemail of Defendant Tiffany Wright, Executive Director of AMHA. *Id.* Wright returned Kemper's call that same day, stating the hearing decision had been issued and any further questions could be directed back to AMHA's counsel. *Id.* AMHA did not provide, and Plaintiff did not attend, any further informal conferences or formal grievance hearings after the April 15, 2024, hearing. *Id.*

As a result of these various interactions, Plaintiff claims Defendants violated both his constitutional and statutory rights. Specifically, Plaintiff alleges Defendants violated his Fourteenth Amendment procedural and substantive due process rights as well as the rights provided to him by the United States Housing Act of 1937 and associated regulations. (Doc. 5, at 12 (citing 42 U.S.C. § 1437d; 24 C.F.R. § 966 *et seq.*)). On Plaintiff's telling, these violations give rise to six individual claims for relief, each of which Plaintiff asserts against Wright in her personal and official capacities, as well as against AMHA. *Id.* at 16–37.

## STANDARD OF REVIEW

A motion to dismiss made pursuant to Federal Rule of Civil Procedure 12(b)(6) charges the Court with assessing the legal sufficiency of a plaintiff's complaint. *See Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). In so doing, the Court must answer only whether the plaintiff's factual allegations, accepted as true, state a legally viable claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Mere legal conclusions, however, are not taken as true, and sufficiently stating a claim for relief therefore requires more than mere "labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## DISCUSSION

In this action brought pursuant to § 1983, Plaintiff alleges Defendants violated his Fourteenth Amendment procedural and substantive due process rights as well as the rights provided to him by the United States Housing Act of 1937 and associated regulations. (Doc. 5, at 12 (citing 42 U.S.C. § 1437d; 24 C.F.R. § 966 *et seq.*)). Section 1983 provides a cause of action to vindicate federal rights, both constitutional and statutory, violated by persons acting under color of state law. *See City of Ranch Palos Verdes v. Abrams*, 544 U.S. 113, 119 (2005) (citing *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980)). Thus, in determining whether a plaintiff has stated a claim for relief under § 1983, they must plausibly allege: "(1) that [they were] deprived of a right secured by the Constitution or laws of the United States, and (2) that [they were] subjected or caused to be subjected to this deprivation by a person acting under color of state law. *See Gregory v. Shelby Cnty.*, 220 F.3d 433, 441 (6th Cir. 2000) (citing *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994)).

Plaintiff asserts both individual and official capacity claims against Director Wright. Official capacity claims against public officers act merely as "another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (citation omitted); *see also Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) ("A suit against an individual in his official capacity is the equivalent of a suit against the governmental entity.") (citation omitted). Individual capacity claims, on the other hand, seek "to hold an official personally liable for the wrong alleged." *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir.

2016) (citing *Essex v. Cnty. of Livingston*, 518 F. App'x 351, 354 (6th Cir. 2013)). Defendants maintain Plaintiff fails to plausibly allege either type of claim. *See* Doc. 7, at 11–14.

As to the individual capacity claims generally, Defendants argue Plaintiffs failed to allege Wright "actively participated" in any constitutional or statutory violation that may have occurred throughout Plaintiff's interactions with AMHA. *Id.* at 11–12. As to the *Monell* claims generally, Defendants argue Plaintiff fails to put forward evidence that AMHA maintains official policies causing Plaintiff's alleged rights deprivations, and that "[a]llegations of the existence of a policy without further factual support are insufficient to survive a motion to dismiss[.]" *Id.* at 12–13. In addition to challenging the extent to which any federal rights deprivation is attributable to either Wright or AMHA, Defendant challenges the sufficiency of Plaintiff's allegations regarding the rights deprivations themselves. *See, e.g.*, *id.* at 16 (arguing Plaintiff has not alleged the deprivation of a property interest sufficient to support a due process claim); *id.* at 17 (arguing informal settlement conferences do not implicate due process guarantees); *id.* at 18–19 (arguing there is no substantive due process right to particular housing benefits or payment policies). The Court analyzes each category of claim in turn.

Individual Capacity Claims

For Plaintiff to state a plausible claim for relief against Wright in her individual capacity, he must lodge factual allegations sufficient to infer Wright personally caused the deprivation of his rights, as distinguished from any deprivation caused by AMHA's policy or custom. *See Peatross*, 818 F.3d at 241; *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019). A deprivation of federal rights caused by a governmental entity's custom or policy is properly analyzed as a claim against the entity under *Monell* rather than as an individual capacity claim. *See*

*Foster v. Walsh*, 864 F.2d 416, 419 (6th Cir. 1988) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–92 (1978)).

*Claim One: Failure to Provide Hearings*

Plaintiff's first claim alleges Director Wright "failed to give [Plaintiff] an informal hearing before issuing termination notices" and "failed to schedule a grievance hearing and informal hearings" following the issuance of all three notices of termination. (Doc. 5, at 17, 24). In effect, Plaintiff alleges Wright denied him the hearings he was entitled to "*each time* there was a grievable event." (Doc. 9, at 9). This alleged failure resulted in a deprivation of the rights afforded to Plaintiff under the due process clause of the Fourteenth Amendment and § 1437d. Defendants offer two challenges in the alternative to Plaintiff's first claim. They argue: (1) Plaintiff has not alleged the deprivation of a property interest to which the due process clause applies; and (2) even if he had, Plaintiff has not adequately alleged Wright personally participated in the deprivation of such a right. (Doc. 7, at 11–12, 16).

While Plaintiff generally alleges "Director Wright and AMHA denied [Plaintiff] an informal or formal hearing" for each notice of termination (Doc. 5, at 24), Plaintiff does not allege facts demonstrating Director Wright personally caused or participated in such a deprivation as is required to establish liability in her individual capacity. *See Essex*, 518 F. App'x at 354. Rather, Plaintiff's only allegations against Wright claim she: (1) called Kemper, Plaintiff's counsel at the time, and directed her to the hearing decision issued after the April 5 hearing; and (2) failed to contact counsel for Plaintiff to reschedule an informal conference or formal grievance hearing for the April 15 notice of termination. (Doc. 5, at 23). Even assuming *arguendo* that the alleged failure to initially provide hearings prior to the April 5 hearing for the November and March termination

9

notices constituted a deprivation of Plaintiff's constitutional or statutory rights,[2] these allegations are insufficient to state a claim for relief against Wright herself. Nowhere does Plaintiff connect Wright's personal, affirmative conduct to this initial denial of hearings and conferences. Similarly, Plaintiff does not allege any of Wright's personal actions caused or otherwise contributed to the deprivation of process due following the issuance of the November and March notices of termination. Plaintiff therefore fails to provide "factual content that allows the court to draw the reasonable inference" that Wright is personally "liable for the misconduct alleged[,]" i.e., the failure to initially provide hearings for the November 30 notice, March 15 notice, or any other alleged grievable event prior to the April 5 hearing. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

Instead, Wright is only alleged to have personally interacted with Plaintiff's counsel after the April 5 hearing. (Doc. 5, at 23). During the May 16 phone call, Plaintiff, in effect, alleges Wright personally failed to provide further process for the April 15 notice of termination and other grievable events allegedly not covered by the April 5 hearing. *Id.* at 23–24. Even assuming Plaintiff was owed further process at this time, Plaintiff fails to allege that Wright had an individual duty to provide such process as opposed to that duty being imposed on AMHA "as a whole." *Doe v. Claiborne Cnty.*, 103 F.3d 495, 511 (6th Cir. 1996) ("[Individual] [l]iability for a failure to act

---

2. To be clear, the Court is skeptical of this assumption. "Due process requires that Housing Program participants receive adequate notice of the grounds for termination, and must be afforded an informal hearing prior to termination." *Woods v. Willis*, 515 F. App'x 471, 478 (6th Cir. 2013) (citing *Davis v. Mansfield Metro. Hous. Auth.*, 751 F.2d 180, 185 & n.4 (6th Cir. 1984)). Here, Plaintiff received exactly that, as AMHA provided multiple notices addressing the basis for the termination of his housing assistance and afforded Plaintiff an opportunity to challenge the basis for the termination decision. Thus, AMHA provided Plaintiff an opportunity to "be fully informed of the case against him so that he may contest its basis and produce evidence in rebuttal[,]" including the opportunity to challenge the basis for the initial notices of retroactive rent owed. *Goldberg v. Kelly*, 397 U.S. 254, 266–271 (1970). The question of whether the hearings themselves employed sufficient procedural protections is analytically distinct and discussed in turn.

necessarily implies a 'duty' to carry out the action the person is accused of derogating."). While AMHA retains such a duty *as an entity*, Plaintiff has not alleged Wright personally owed him this same duty. *Id.*; *cf.* 42 U.S.C. § 1437d(k) (requiring the Secretary of Housing and Urban Development to institute regulations requiring "each *public housing agency*… to establish and implement an administrative grievance procedure") (emphasis added). Thus, Plaintiff's First Claim fails to the extent it is asserted against Wright in her personal capacity.

*Claims Two and Three: April 5 Hearing Procedures*

Plaintiff's second and third claims center around the procedures employed during the April 5 hearing. Claim Two alleges Smith's role at the April 5 hearing as a "neutral" hearing officer violates Plaintiff's Fourteenth Amendment due process rights and the rights secured to him under 42 U.S.C. § 1437d(k) and 24 C.F.R. §§ 966.53(a) & 966.56(a). (Doc. 5, at 25–27; Doc. 11, at 11). Claim Three alleges Smtih's role as hearing officer at the April 5 hearing deprived Plaintiff of his ability to examine a witness in violation of his Fourteenth Amendment due process rights and the rights secured to him under 42 U.S.C. § 1437d(k). Defendants offer four grounds supporting the dismissal of these two claims as asserted against Wright in her personal capacity. They argue: (1) Plaintiff has not alleged the deprivation of a property interest to which the due process clause's guarantees attach; (2) no due process guarantees attached to the April 5 hearing, as it was merely an "informal settlement conference[;]" (3) even if due process guarantees did attach thereto, Plaintiff fails to allege Smith was improperly biased in his role as neutral adjudicator; and (4) even if Plaintiff establishes a deprivation of his constitutional or statutory rights, he fails to allege Wright directly participated in such a deprivation. *See* Doc. 7, at 11–12, 16, 17–18. The Court begins with Defendants' third argument.

Prior to the termination of his public housing tenancy, Plaintiff's Constitutional right to due process entitled him to a final decision rendered by a neutral and impartial decision maker. *See, e.g.*, *Shavers v. Youngstown Metro. Hous. Auth.*, 397 F. Supp. 483, 486 (N.D. Ohio 1975) (enjoining a public housing authority from terminating residency of public housing tenants "without first providing for an impartial pre-termination administrative hearing which satisfies the due process clause of the Fourteenth Amendment"); *Woods*, 515 F. App'x at 479–80 (holding "termination of housing benefits" requires a final decision to be made before an impartial decision maker). Regulations governing AMHA provide the same guarantee with respect to formal grievance hearings in the public housing context. *See* 24 C.F.R. § 966.53(a) (defining a hearing officer as "an impartial person or persons selected by the" public housing authority); *id.* at § 966.56(a) (providing that the grievance hearing must take place "before a hearing officer"); *accord* 42 U.S.C. § 1437d(k) (requiring the regulatory framework governing public housing agencies to guarantee tenants "an opportunity for a hearing before an impartial party").[3]

The fact that a governmental entity such as AMHA serves as both "prosecutor and as judge" during its hearings "does not alone result in a violation of . . . due process." *Stevenson v. Willis*, 579 F. Supp. 2d 913, 920 (N.D. Ohio 2008) (quoting *Cobb v Yeutter*, 889 F.2d 724, 730 (6th Cir. 1989)). Nor could it be otherwise, as the vast majority of non-judicial administrative

---

3. The Court assumes, without deciding, that 42 U.S.C. § 1437d and regulations flowing therefrom create an individual federal right for which § 1983 provides a cause of action to vindicate. *See, e.g.*, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 280–83 (2002); *Yarbrough v. Decatur Hous. Auth.*, 931 F.3d 1322, 1325 (11th Cir. 2019) (explaining that plaintiffs bringing suit under § 1983 for "violations of agency regulations" must prove the regulation "further defines a right created by statute"). Neither party raised the issue at this stage in the proceedings, and "[t]he question [of] whether [p]laintiffs have a cause of action is a merits issue that is 'analytically distinct from the question whether a federal court has subject-matter jurisdiction.'" *Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 391 (6th Cir. 2016) (quoting *Roberts v. Hamer*, 655 F.3d 578, 580 (6th Cir. 2011)). Thus, the Court need not independently determine whether § 1437d and its attendant regulations create individual rights enforceable pursuant to § 1983.

hearings are conducted by employees or agents of the entity with which the individual has a dispute. Additionally, hearing officers and other adjudicators, including Smith, generally enjoy a "presumption of honesty and integrity" in their role as hearing officer. *See Withrow v. Larkin*, 421 U.S. 35, 47 (1975). Plaintiff may rebut this presumption by demonstrating, and, at this stage in the proceedings, plausibly alleging, that a single individual served both an advocacy and adjudicative role at a given hearing. *See Stevenson*, 579 F. Supp. 2d at 920 (quoting *Hammond v. Baldwin*, 866 F.2d 172, 177 (6th Cir. 1998)). In effect, combining the role of advocate and adjudicator in a single individual may give rise to a plausible inference of impermissible bias on behalf of the decisionmaker. *Id.*

Plaintiff does not allege a single individual acted as both AMHA's direct advocate and the adjudicator during the April 5 hearing. Rather, AMHA, operating through its employee Betty Boyer, advocated for AMHA's position and Smith, for whom AMHA was a client, served as the hearing officer. (Doc. 5, at 26). Nevertheless, the personnel involved in the April 5 hearing created the exact risk of structural bias in the adjudicator that may plausibly constitute a deprivation of Plaintiff's federal rights. Primarily, this is because Smith, acting as counsel for AMHA during all relevant periods, maintained a strict ethical duty of loyalty to AMHA. *See* Ohio Prof. Conduct R. 1.7. In order to comply with this duty, Smith could not have acted as an impartial or neutral decisionmaker at the April 5 hearing, as doing so would render Smith's capacity to advocate for his client "materially limited as a result of [Smith's] other responsibilities or interests." *Id.* & cmt. 14; *cf.* 24 C.F.R. § 966.53(a). Thus, while Smith did not formally appear on behalf of AMHA's position at the April 5 hearing, he operated under a clear ethical duty to act in the best interest of AMHA throughout it -- effectively combining the role of adjudicator and advocate in a single individual. *See Stevenson*, 579 F. Supp. 2d at 920. Plaintiff's allegations that Smith maintained

competing legal responsibilities during the April 5 hearing, accepted as true, are therefore sufficient to support Plaintiff's burden to rebut the presumption of honesty and integrity by offering "convincing evidence a risk of actual bias or prejudgment [was] present" at the April 5 hearing. *Navistar Int'l Transp. Corp. v. E.P.A.*, 941 F.2d 1339, 1360 (6th Cir. 1991) (quoting *Withrow*, 421 U.S. at 47). Thus, Plaintiff plausibly alleges Smith's role as hearing officer at the April 5 hearing violated his Fourteenth Amendment right to due process and his right to an impartial hearing officer pursuant to 42 U.S.C. § 1437d(k)(2) and 24 C.F.R. §§ 966.53(a) & 966.56(a).

Similarly, Claim Three sufficiently alleges a deprivation of Plaintiff's rights to process, both Constitutional and statutory, based on his inability to cross-examine necessary witnesses and effectively present his own case. *See Unan v. Lyon*, 853 F.3d 279, 291 (6th Cir. 2017) (quoting *Goldberg*, 397 U.S. at 267–68) (explaining due process requires an individual receive the opportunity to present his own arguments and confront adverse witnesses "[i]n the context of the denial of public benefits"); 24 C.F.R. § 966.56(b)(4) (granting the tenant "[t]he right to present evidence and arguments" and to "confront and cross-examine all witnesses upon whose… information the PHA or project management relies"); *accord* 42 U.S.C. § 1437d(k)(5). Thus, a deprivation occurs where the tenant is deprived of the ability *either* to effectively present their own case at the hearing or to cross-examine witnesses the entity relies on to establish its case. *Goldberg*, 397 U.S. at 267–68.

Here, Plaintiff sufficiently alleges both species of deprivation. First, Plaintiff alleges Kemper, counsel for Plaintiff at the April 5 hearing, was "unable to cross-examine" Smith regarding AMHA's failure to provide an informal hearing for the November 30 notice of termination, the rental recalculation notices, and the March 15 notice of termination. (Doc. 5, at

14

30). While AMHA did not seek to conduct a direct examination of Smith, Plaintiff alleges Smith had "knowledge regarding AMHA's alleged grounds" for the notices of termination issued to Plaintiff, including Plaintiff's "alleged failure to pay down the overpayment, or to sign up for a repayment plan." *Id.* These grounds turned on questions of fact, including when Plaintiff began receiving Unemployment and Social Security benefits, when he provided adequate notice of such receipt, and what process Plaintiff received before and after the November and March notices of termination. *See id.* at 30–31; Doc 5-10, at 1–3. Plaintiff repeatedly alleges Smith participated in communications related to recalculation and retroactive application of Plaintiff's rent, as well as Plaintiff's attempts to obtain process addressing the same. *See, e.g.*, Doc. 5, at 4–5, 18–22. Because of Smith's role as hearing officer on April 5, Plaintiff alleges he was denied "the opportunity to question" Smith regarding the factual determinations underlying the substantive grounds for and procedural protections regarding AMHA's various notices of termination and retroactive rent recalculations. *Id.* at 31; Doc. 11, at 13. Accepted as true, these allegations plausibly allege Plaintiff was deprived of his ability to confront those individuals that AMHA relied on to establish the factual determinations necessary to justify the termination of Plaintiff's tenancy. *See Rosen v. Goetz*, 410 F.3d 919, 928 (6th Cir. 2005) (citing *Goldberg*, 397 U.S. at 268) (explaining the due process rights specified in *Goldberg* attach where there exists a factual dispute between the benefits recipient and the governmental entity).

Relatedly, Plaintiff alleges Smith's position as hearing officer prevented him from eliciting direct testimony regarding the process provided to Plaintiff in connection with the November and March notices of termination. (Doc. 5, at 30). Further, Plaintiff alleges this testimony would have been used to establish facts necessary to justify invalidating the notices of termination issued by AMHA. *Id.* at 30–31. Taken as true, these allegations are sufficient to support a finding that

Smith's position as hearing officer deprived Plaintiff of his ability to meaningfully present his own case before the AMHA regarding the validity of the notice of termination affirmed at the April 5 hearing and the imposition of retroactive rent fees. *See Goldberg*, 397 U.S. at 268.

After finding Plaintiff sufficiently alleges a deprivation of his constitutional and statutory based in Smith's dual role at the April 5 hearing, the Court turns to Defendants' remaining arguments. First, Defendants maintain the April 5 hearing was only an "informal settlement conference" that does not implicate and is not governed by the Fourteenth Amendment's due process guarantee. (Doc. 7, at 17–18). Initially, this line of argument raises issues seemingly not contemplated by Defendants. For, if the April 5 hearing was an informal conference, that informal conference "[did] not implicate due process" protections, no hearing that did provide such protections occurred after April 5, and Defendants nevertheless affirmed the decision to terminate Plaintiff's public housing tenancy, then Defendants have effectively admitted to depriving Plaintiff of his protected property interest without the process the Fourteenth Amendment guarantees him. *See Davis*, 751 F.2d at 184–85 & n.4 (maintaining due process requires a hearing with procedural guarantees, including the right to obtain counsel, present evidence, and confront witnesses, before one's "participation in a public housing program" may be terminated).

Regardless, Plaintiff specifically alleges Smith himself communicated to Kemper that, because Plaintiff failed to appear for an informal conference, the April 5 hearing was "a formal grievance hearing." (Doc. 5, at 7). This comports with the alleged structure of the April 5 hearing, as the presence of a hearing officer, counsel for Plaintiff, an advocate on behalf of AMHA (Betty Boyer), and a final written disposition summarizing the hearing officer's findings are hallmarks of a formal grievance hearing. *Compare* 24 C.F.R. § 966.54 (providing only for a written "summary of such discussion" as occurred during an informal conference), *with id.* at § 966.56(b)

16

(guaranteeing the tenant a right to examine records, obtain counsel, present evidence, cross-examine witnesses, and to a hearing officer). The Court is not persuaded that the label attached to Smith's written opinion (Doc. 5-10, at 1) or Plaintiff's post-hoc request to treat the April 5 hearing as an informal conference (Doc. 5, at 22) are legally dispositive of the April 5 hearing's formal or informal nature. Rather, Plaintiff alleged sufficient factual information, taken as true, to support a finding that the April 5 hearing was a formal grievance hearing to which the protections of the due process clause and 24 C.F.R. § 956.66(b) attach.

Further, Defendants argue that Plaintiff, because he continues to reside in the public housing unit provided by AMHA, has not suffered a "deprivation of property" giving rise to a due process claim actionable pursuant to § 1983. (Doc. 7, at 16); *Cahoo v. SAS Analytics, Inc.*, 912 F.3d 887, 900 (6th Cir. 2019) ("To state their procedural due process claim, [p]laintiffs must establish three elements: (1) that they have a property interest protected by the Due Process Clause; (2) that they were deprived of this property interest; and (3) that the state did not afford them adequate pre-deprivation procedural rights."). This argument is misplaced. Plaintiff does not solely have a property interest in his continued residence in public housing. Rather, Plaintiff's vested property interest applies to his continued "participation" in the public housing program generally, *see Woods*, 515 F. App'x at 478, and the benefits received therefrom, including his subsidized rental agreement, *cf. Baker v. Cincinnati Metro. Hous. Auth.*, 490 F. Supp. 520, 531 (S.D. Ohio 1980) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Plaintiff has a "legitimate claim of entitlement" to the rent payment instituted by his original lease agreement, and the AMHA may not retroactively revoke those benefits, effectively saddling Plaintiff with significant retroactive rent obligations, without first providing Plaintiff due process. *Roth*, 408 U.S. at 577.

17

Additionally, Plaintiff's statutory rights, which may protect more than just those property interests covered by the Fourteenth Amendment, guarantee him process protections as to "any proposed adverse public housing agency action." 42 U.S.C. § 1497d(k)(1). Violations of these statutory rights are actionable under § 1983 independent of whether Plaintiff alleged a deprivation of a property interest covered by the Fourteenth Amendment. *See Abrams*, 544 U.S. at 119. Thus, Plaintiff has sufficiently alleged he suffered an injury sufficient to support a claim for relief under § 1983.

Defendants only remaining argument for dismissal on Plaintiff's second and third claims as to Wright in her personal capacity is that he fails to allege Wright's personal involvement in the alleged rights deprivations. *See* Doc. 7, at 11–12. After alleging a deprivation of a federal right sufficient to state a claim pursuant to § 1983, Plaintiff must also allege, in these personal capacity claims specifically, that Wright herself directly participated in and caused such deprivation. *See Peatross*, 818 F.3d at 241 (quoting *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989)). Claims brought pursuant to § 1983 in this manner may not be based merely on *respondeat superior*, or "the right to control employees." *Shehee v. Lutrell*, 199 F.3d 295, 300 (6th Cir. 1999) (citing *Hays v. Jefferson Cnty.*, 668 F.2d 869, 874 (6th Cir. 1982)). Instead, to support an individual capacity claim, Plaintiff must allege some direct, personal involvement of Wright such that Wright's direct actions, not the entity's policy or custom, may be deemed a cause of the deprivation of Plaintiff's federal rights. *See Peatross*, 818 F.3d at 241 (quoting *Leach*, 891 F.2d at 1245). Where the individual against whom the plaintiff brings suit is a supervisor of subordinate officials, the plaintiff must allege the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official

at least implicitly authorized, approved, or knowingly acquiesced in" the unconstitutional conduct of the subordinate. *Hays*, 668 F.2d at 874.

Construed in favor of Plaintiff, the Complaint plausibly alleges Wright, acting in her supervisory role over Smith, knowingly acquiesced in the alleged rights deprivations resulting from Smith's dual role at the April 5 hearing. Similar to Claim One, Plaintiff does not allege Wright was present at or otherwise directly involved in Smith's dual role at the April 5 hearing. Rather, Plaintiff alleges Wright: (1) had knowledge of Smith's role as hearing officer at the April 5 hearing; and (2) directed Kemper to the hearing decision, authored by Smith, as a "resolution for the ongoing issues[,]" including the alleged need for further process. (Doc. 5, at 30–31). Taken as true, these allegations go beyond a "mere failure to act" in the presence of a subordinate's deprivation of an individual's federal rights. *Salehpour v. Univ. of Tennessee*, 159 F.3d 199, 206 (citing *Leach*, 891 F.2d at 1246). In particular, Wright's decision to direct Kemper to the April 5 hearing and Smith's subsequent opinion as the final resolution of matters between the parties plausibly amounts to implicit approval of or, at the very least, acquiescence to, the procedures employed at the April 5 hearing. *Hays*, 668 F.2d at 874. When given the opportunity to disavow the procedures employed at the April 5 hearing or otherwise deemphasize their finality, Wright instead tacitly offered an "affirmative endorsement" of the hearing as the final resolution of the dispute between AMHA and Plaintiff. *Kuzma v. Douglas*, 2025 WL 719073, at *5 (E.D. Mich.) (citing *Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992)). Thus, Plaintiff plausibly alleges Wright knowingly acquiesced and was personally involved in the deprivation of Plaintiff's

constitutional and statutory rights at the April 5 hearing. *See Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008).[4]

*Claims Four, Five, and Six: Rent Recalculation Decisions & AMHA's Repayment Policy*

In his next set of claims, Plaintiff alleges numerous substantive and procedural due process violations against Wright in her personal capacity. Claim Four maintains Wright is responsible for Smith's "improper decision" following the April 5 hearing, particularly by "improperly shift[ing] AMHA's burden to correctly recalculate and recertify [Plaintiff's] rent" and failing to issue a "decision that rests solely on the facts presented at the hearing." (Doc. 5, at 32–33). Claim Five asserts Wright violated Plaintiff's unspecified substantive due process right by failing to "correctly calculate[e] his overpayment amount and untimely recertifying his rent payments." *Id.* at 34. Claim Six alleges Wright violated Plaintiff's statutory and substantive due process rights[5] by enforcing the policy requiring Plaintiff to reduce his balance below $1,000 prior to being eligible for a repayment plan. *Id.* Defendants, as they did for Plaintiff's first three claims, argue Plaintiff fails to allege Wright directly participated in any alleged rights deprivation. *See* Doc. 7, 11–12. Because the Court agrees with Defendants on this point, it declines to presently consider the other grounds

---

4. Defendants do not directly contest Wright's status as Smith's supervisor for purposes of establishing liability under § 1983 for the procedures employed at the April 5 hearing. Instead, Defendants argue Plaintiff's Complaint failed to allege facts sufficient to demonstrate Wright "failed to train, supervise, or control staff." (Doc. 7, at 11–12). Thus, the Court assumes, without deciding, that Wright was legally capable of serving as a supervisor of Smith in his capacity as hearing officer at the April 5 hearing. *See Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984) (Explaining a supervisor is only liable if they meaningfully participated in the "conduct of the offending *subordinate*") (emphasis added) (citing *Hays*, 668 F.2d at 872–84).

5. Plaintiff does not directly specify whether the alleged deprivation is grounded in the Fourteenth Amendment's procedural or substantive due process guarantee. However, the Court construes the Complaint as alleging a deprivation of the latter, as the reasonableness of a particular policy speaks to its substance rather than the procedure with which it was adopted or enforced.

potentially justifying dismissal of Plaintiffs fourth, fifth and sixth claims as asserted against Wright in her personal capacity.

In effect, Plaintiff fails to identify in these claims any actions taken by Wright that plausibly caused a deprivation of Plaintiff's federal rights. Claim Four, similar to Claims Two and Three, addresses procedures employed at the April 5 hearing but does not allege Wright either had knowledge of the alleged burden shift or in any way approved of or acquiesced to such a shift. *Hays*, 668 F.2d at 874 ("[A] plaintiff must show that the official at least implicitly authorized, approved, or *knowingly* acquiesced in the unconstitutional conduct of the offending [subordinate].") (emphasis added). Thus, Plaintiff fails to allege Wright personally participated in the alleged violations described in Claim Four.

Claims Five and Six are entirely unsupported by any factual allegations involving Wright in her personal capacity. In both instances, Plaintiff summarily concludes Wright violated Plaintiff's substantive and procedural due process rights, as well as his statutory rights. Absent from both claims is an allegation suggesting Wright engaged in her "own unconstitutional behavior." *Leach*, 891 F.2d at 1246. The only mention of Wright's conduct as to these claims involves her decision to "promulgat[e] and enforce[e] an unreasonable and prohibitive repayment plan *policy*[.]" (Doc. 5, at 35) (emphasis added). Allegations that a municipal entity's policy caused the deprivation of Plaintiff's rights are properly analyzed under the lens of *Monell*, which the Court now turns to.

<u>*Monell* Claims</u>

Properly understood, official capacity claims against public officials act merely as "another way of pleading an action against an entity of which an officer is an agent." *Graham*, 473 U.S. at 165 (citation omitted); *see also Matthews*, 35 F.3d at 1049. Thus, the claims brough against Wright

in her official capacity and those brought against AMHA as such are governed by the same standard and will stand or fall together. *See Kraemer v. Luttrell*, 189 F. App'x 361, 366 6th Cir. 2006) ("[A] successful suit against a municipal officer in his official capacity must meet the requirements for municipal liability stated in *Monell*.").[6] To survive a motion to dismiss, Plaintiff must sufficiently allege AMHA, acting through Wright in her official capacity, maintained a "'policy or custom' that caused the violation of his rights." *Jackson*, 925 F.3d at 828 (quoting *Monell*, 436 U.S. at 694). With respect to all but Claim Six, Defendant argues Plaintiff fails to allege either the existence of an official policy or, alternatively, facts sufficient to establish unofficial custom or practice causing Plaintiff's alleged rights deprivations. *See* Doc. 7, at 12–14.

Generally, "[t]here are four methods of showing the municipality had such a policy or custom: the plaintiff may prove '(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.'" *Jackson*, 925 F.3d. at 828 (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)).

Consistent with the standards set forth in *Iqbal*, Plaintiff's *Monell* claims may not rely on conclusory allegations that an entity's custom or policy caused the alleged deprivation of a federal right. Rather, Plaintiff must set forth particular, factual allegations plausibly establishing both the existence of an actionable custom or policy and causation. *Sistrunk v. City of Hillview*, 545 F. Supp. 3d 493, 501 (W.D. Ky. 2021). If no official enactment or *policy* exists, Plaintiff's factual allegations must generally extend beyond a single occurrence of unlawful behavior, "which alone

---

6. Defendants do not contest AMHA's status as a municipal entity potentially subject to liability for a claim brought under *Monell*. (Doc 7, at 12–13).

does not plausibly allege a continuous *custom* of" federal rights deprivations. *Coleman v. Hamilton Cnty. Bd. of Cnty. Comm'rs*, 130 F.4th 593, 601 (6th Cir. 2025) (emphasis added) (citing *Franklin v. Franklin Cnty.*, 115 F.4th 461, 472 (6th Cir. 2024)); *see also Alabasi v. City of Lyndhurst*, 2020 WL 5369321, at * 5 (N.D. Ohio) (dismissing a *Monell* claim where the plaintiff "offer[ed] nothing beyond the conclusory allegation of a policy or custom and the [violation] in question to support their claim").

       *Claims One, Four, and Five*

       The Court agrees with Defendants that Claims One, Four, and Five, lack sufficient factual information plausibly suggesting AMHA maintains a custom or policy that caused the rights deprivations alleged therein. With respect to Claim One, Plaintiff conclusorily states only that it is AMHA and Wright's "pattern and practice" to deny "informal hearings" and other process to support Plaintiff's conclusion that "it is the custom, policy, and practice of [Wright] and AMHA to deny informal hearings" in violation of "the Due Process Clause of the Fourteenth Amendment." (Doc. 5, at 24–25). The facts supporting this "pattern and practice" center around the alleged failure to provide process as to the three separate notices of termination issued by AMHA to Plaintiff. *Id.* at 24. That is insufficient. The facts included in Plaintiff's Complaint, taken as true, describe little more than a singular, if drawn out, transaction between Plaintiff and AMHA. All communications regarding process due, including informal conferences and grievance hearings, were the result of the course of conduct AMHA determined Plaintiff had engaged in, i.e., his failure to timely and accurately notify AMHA of his change in income. The amount and form of process due to that adverse determination is a singular question, the resolution of which, even if adverse to AMHA, does not constitute a "continuing custom" of failing to provide due process to tenants such as Plaintiff. *Coleman*, 130 F.4th at 601. Any allegation to the contrary, including that AMHA

maintained an official policy of denying tenants informal or formal process, is nothing more than a "legal conclusion[] or unwarranted factual inference[,]" which the Court need not accept as true. *Kottmeyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006) (citing *Gregory*, 220 F.3d at 446).

Claims Four and Five are similarly deficient in this respect. Claim Four contains no factual allegations beyond those related to the issuance of Smith's written hearing opinion, before claiming it is the custom and policy of AMHA and Wright to "fail to provide proper and timely hearing decisions." (Doc. 5, at 33). Even assuming the substance of the decision or procedures producing it were legally insufficient, outlining a single instance of unlawful conduct does not plausibly allege the maintenance of an unconstitutional or unlawful policy or custom. *See Winkler v. Madison Cnty.*, 893 F.3d 877, 902 (6th Cir. 2018) (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005)). Plaintiff's fifth claim fares no better. While Plaintiff briefly attempts to describe the recertification, recalculation, and retroactive application of Plaintiff's rent obligation as "three separate occasions" of misconduct, Plaintiff's own Complaint states that AMHA's present position is described in the May 8 hearing decision. (Doc. 5, at 8, 27, 32). That decision lists Plaintiff's retroactive rent obligation at $2,078 and his monthly rent obligation at $224. (Doc. 5-10, at 3; Doc. 5, at 31). Further, Plaintiff describes the recalculation contained in the May 8 hearing decision as the "corrected" calculation. (Doc. 5, at 32). The Sixth Circuit's decision in *Winkler* is on point. There, the decedent's estate brought a *Monell* claim against the County for maintaining a custom or practice of not following its own procedures with respect to providing healthcare to the imprisoned. *Winkler*, 893 F.3d at 902. In support of this custom or practice, the estate described multiple days over which the County and its affiliates allegedly failed to provide the decedent with adequate medical attention. *See id.* at 886–89 (describing the relevant events over a one-week time period). Despite describing and providing evidence for multiple

24

individual instances of allegedly insufficient medical attention, the court found as a matter of law that, because the estate discussed only the decedent's treatment, they could not establish the County had a "custom of deliberate indifference to the serious healthcare needs of all the inmates incarcerated" at the County's facility. *Id.* at 902 (citing *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006)). In doing so, the court indicated the single transaction between the decedent and the County operated as a "single instance" insufficient as a matter of law to support liability under *Monell*. *Id.* Here, Plaintiff, despite describing multiple improper recalculations, recertifications, and retroactive applications of his own rent obligations, fails to offer any allegations AMHA did so with respect to other tenants or over the course of multiple distinct instances. Instead, Plaintiff points only to the multiple steps leading to AMHA's final conclusion contained in the May 8 hearing decision. Plaintiff's failure in this regard renders his allegations insufficient to support a claim for liability under *Monell*.

*Claim Six*

Claim Six unequivocally alleges Wright and AMHA "promulgat[ed] and enforce[ed]" an unlawful repayment plan policy that "prevented [Plaintiff] from entering a repayment plan unless he could pay down the amount below $1,000[.]" (Doc. 5, at 35). This falls squarely within the first method of demonstrating AMHA maintained an unlawful custom or policy, as Plaintiff clearly describes (and attaches to his Complaint) AMHA's "official policy" of terminating a tenant's leasehold if they are unable to make a down payment to reduce their total amount owed below $1,000. (Doc. 5-11, at 2; Doc 5, at 35–37); *Jackson*, 925 F.3d at 838 (citing *Burgess*, 735 F.3d at 478). Nor do Defendants seemingly challenge the repayment policy's status as an official policy for purposes of establishing municipal liability under *Monell*.

25

Because Plaintiff alleges AMHA maintains this policy, the Court must determine whether Plaintiff plausibly alleges the policy caused a deprivation of a fundamental substantive right guaranteed by the due process clause of the Fourteenth Amendment. He does not. Initially, Plaintiff does not allege AMHA's policy is violative of a right enumerated in the first ten Amendments and incorporated by way of the Fourteenth. *Timbs v. Indiana*, 586 U.S. 146, 150–51 (2019). Thus, Plaintiff must allege the policy is violative of some unenumerated right "not mentioned anywhere in the Constitution" that is nevertheless "objectively, deeply rooted in this Nation's history and tradition." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 238–39 (2022) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997)). But Plaintiff makes no attempt to clearly identify nor describe the contours of any such fundamental substantive right. *Cf. Johnson v. City of Cincinnati*, 310 F.3d 484, 495 (6th Cir. 2002) (explaining the Court must first be able to "carefully define the asserted right" before asking whether it satisfies the test outlined in *Glucksberg*).[7] Nor does Plaintiff make any attempt to offer historical support for the assertion that public housing tenants enjoy the right not to be subjected to repayment plans of a particular severity. These shortcomings end the Court's constitutional inquiry.

Plaintiff also fails to convince the Court the U.S. Housing Act of 1937, or regulations instituted according to the Act, bar AMHA from adopting or enforcing this repayment policy. Initially, Plaintiff fails to identify any particular provision of the Act mandating such a result. (Doc. 5, at 35–37). Rather, Plaintiff offers only vague references to the "purpose of subsidized" and "low-income housing program[s]" to support the conclusion that AMHA's repayment plan policy

---

7. To be clear, Plaintiff does have a property interest in his continued participation in AMHA's public housing program. *See Davis*, 751 F.2d at 184. That property interest affords him procedural rights under the Fourteenth Amendment, it does not prevent AMHA from establishing substantive rules governing tenant relations such as the repayment plan at issue.

is unlawful pursuant to the Act. The statutory text offers Plaintiff little help. 42 U.S.C. §§ 1437d(k)–(l) (covering public housing tenants such as Plaintiff). The provision most plausibly supporting Plaintiff's claim is § 1437d(l)(2), which mandates public housing leases "do not contain unreasonable terms and conditions." Plaintiff, however, fails to allege that AMHA's policy is a condition or term of his lease rather than a policy of the entity generally. *See, e.g.*, *Elliott v. City of New York*, 723 F. Supp. 3d 249, 269 (S.D.N.Y. 2024) (dismissing a § 1983 claim for failure to state claim where the plaintiff failed to allege the challenged policy was a condition of the plaintiff's lease agreement). Even if Plaintiff had alleged as much, § 1437d(l)(2)'s reasonability standard requires only that the term be "rationally related to a legitimate housing purpose." *Sager v. Hous. Comm'n*, 957 F. Supp. 2d 627, 639–40 (D. Md. 2013) (collecting cases). Only those terms which are "arbitrary and capricious, or excessively overbroad or under-inclusive, will be invalidated." *Richmond Tenants Org. v. Richmond Redev. & Hous. Auth.*, 751 F. Supp. 1204, 1206 (E.D. Va. 1990). The Court does not find, nor does Plaintiff offer, any reason to believe AMHA's repayment policy is arbitrary and capricious. *Cf. Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987) (per curiam) ("[N]o legislation pursues its purposes at all costs."). Thus, Plaintiff's fifth claim fails to plausibly allege AMHA is liable for maintain an unlawful repayment policy.

*Claims Two and Three*

Claims Two and Three, however, present a closer call. As discussed with respect to Wright in her individual capacity, Plaintiff's Complaint plausibly alleges Smith's dual role as AMHA's attorney and as the hearing officer at the April 5 hearing deprived Plaintiff of his constitutional and statutory rights. These violations were properly attributable to Wright in her individual, supervisory capacity because Plaintiff alleged facts sufficient to support an inference that Wright at least knowingly acquiesced to the procedures employed at the April 5 hearing. *Hays*, 668 F.2d

at 874. In the context of *Monell*, it is possible for "a single decision [to] constitute a *policy*" where that decision is "ratified by an official with final decision-making authority." *Wallace v. Coffee Cnty.*, 852 F. App'x 871, 877 (6th Cir. 2021) (citation modified) (quoting *Flagg v. City of Detroit*, 715 F.3d 165, 174 (6th Cir. 2013)); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality) ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."). Alleging the existence of a municipal policy under *Monell*, however, requires more than a supervisor's "mere acquiescence in a single discretionary decision by a subordinate[.]" *Felciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993) (citing *Praprotnik*, 485 U.S. at 127). Rather, the subordinate's decision must be "subject to review" such that the municipal entity's policymaker has "retained the authority to measure the [subordinate] official's conduct for conformance with" the entity's policies. *Praprotnik*, 485 U.S. at 127. Thus, to constitute ratification for the purposes of *Monell*, the individual with policymaking authority must "issue[] a final decision affirming a subordinate's decision and, thereby, adopt[] it as municipal policy." *Hester v. Chester Cnty.*, 2024 WL 3641754, at *8 (W.D. Tenn.).

While Plaintiff sufficiently alleges Wright acquiesced in or informally approved of Smith's role at the April 5 hearing, there are no allegations sufficient to support an inference that Wright ratified Smith's dual role such that Wright adopted such a role as municipal policy. Again, Plaintiff alleges only that Wright knew of Smith's dual role at the April 5 hearing and directed Kemper "to the grievance hearing decision as a resolution for the ongoing issues." (Doc. 5, at 31). Taken as true, those allegations support an inference that Wright personally acquiesced in or approved of Smith's role at the April 5 hearing. They do not plausibly support an inference that Wright, acting in her official capacity, "issued a final decision" affirming Smith's role at the April 5 hearing such

that Wright "adopt[ed]… as municipal policy" the decision to have attorneys for AMHA serve as neutral adjudicators at informal or formal hearings. *Hester*, 2024 WL 3641754 at *8. Thus, Plaintiff's second and third claims fail to allege AMHA maintained a policy or custom that caused the deprivation of Plaintiff's federal rights. That failure requires dismissal of Plaintiff's claims as to Wright in her official capacity and, accordingly, as to AMHA itself.

<u>Plaintiff's Motion to Disqualify</u>

Plaintiff seeks disqualification *in toto* of attorney Dalton Smith as counsel for Defendants in this matter. (Doc. 13, at 3–4).[8] Plaintiff raises two distinct grounds supporting disqualification. First, Plaintiff argues Smith is a necessary witness in the case as Plaintiff's "claims in this matter are largely based on what Attorney Smith did and did not do." *Id.* at 6. Second, Plaintiff argues Smith's continued role as counsel for Defendants creates a "substantial risk of a conflict" between Smith's duty to advise Defendants and "Smith's personal interests in this matter." *Id.* at 8. Defendants do not directly contest Smith's status as a necessary witness. (Doc. 15, at 1–2). Rather, Defendants argue only that, even if Smith is a necessary witness, he need only be disqualified from acting as Defendants' trial counsel in this matter. *Id.* at 2.

"The power to disqualify an attorney from a case is 'incidental to all courts, and is necessary for the preservation of decorum, and for the respectability of the profession.'" *Kitchen v. Aristech Chem.*, 769 F. Supp. 254, 256 (S.D. Ohio 1991) (quoting *Ex Parte Burr*, 22 U.S. 529, 531 (1824)). However, because denying a party its preferred representative is a "potent weapon[,]" the Court must carefully balance the interest of protecting the judicial process with the interests of each party. *Id.* (citing *Gen. Mill Supply Co. v. SCA Servs., Inc.*, 697 F.2d 704, 711(6th Cir. 1982)). In balancing these interests, the Court must look to the ethical code that binds the attorney in

---

8. The parties do not dispute the facts relevant to Plaintiff's Motion to Disqualify.

question. *See Nat'l Union Fire Ins. Co. v. Alticor, Inc.*, 466 F.3d 456, 457 (6th Cir. 2006), *vacated in part on other grounds*, 472 F.3d 436 (6th Cir. 2007). Here, the parties agree that is the Ohio Rules of Professional Conduct. (Doc. 13, at 4; Doc. 15 at 1); *see also* N.D. Ohio Civ. R. 83.7(a) ("Attorneys admitted to practice in this Court shall be bound by the ethical standards of the Ohio Rules of Professional Conduct[.]").

With respect to Plaintiff's first argument, the Court agrees Smith is a necessary witness in this case. Rule 3.7 of the Ohio Rules of Professional Conduct states an attorney "shall not act as an *advocate at a trial* in which the [attorney] is likely to be a necessary witness." (emphasis added). "Under Ohio law, an attorney is a 'necessary witness' if the 'counsel's testimony is relevant and material to the determination of the issues being litigated and unobtainable elsewhere.'" *J.M. Smucker Co. v. Weston Firm, P.C.*, 2013 WL 3713457, at *4 (N.D. Ohio) (quoting *Brown v. Spectrum Networks, Inc.*, 180 Ohio App. 3d 99, 104–05 (2008)). As previously explained, Plaintiff plausibly alleged the procedures employed at the April 5 hearing, particularly Smith's dual role as hearing officer, deprived him of his Constitutional and statutory rights. To substantiate these allegations, particularly with respect to his second claim for relief, Plaintiff will bear the burden of offering "convincing evidence that 'a risk of actual bias or prejudgment' [was] present" in Smith at the April 5 hearing. *Navistar*, 941 F.2d at 1360 (quoting *Withrow*, 421 U.S. at 47). Smith's subjective state of mind, including his understanding of his ethical duties as AMHA's outside counsel, the subjective basis for his decision, and how Smith understood his role as adjudicator, are both relevant and material to satisfying that burden. *Brown*, 180 Ohio App. 3d at 105. Smith is the only individual capable of testifying to his internal, subjective state of mind at the April 5 hearing, meaning his testimony on these subjects is "unobtainable" from any other witness. *Id.*

30

Ohio Rule of Professional Conduct 3.7(a) therefore covers Smith, and Defendants do not contend that an exception applies pursuant to Rule 3.7(a)(1)–(3).

The Court, however, does not find it necessary to disqualify Smith from the case *in toto*. Rule 3.7(a) mandates only that an attorney who is also a necessary witness may not be an advocate at trial. While the "trial" contemplated here may be "connected as a seamless web to the ascertainment of issues at the pretrial proceedings, and particularly to the discovery depositions," it is not connected to *everything*. *Gen. Mill Supply*, 697 F.2d at 716. Thus, in balancing the interests of the parties and the interest in the proper dispensation of justice, a remedy narrower than total disqualification is appropriate. Consistent with Defendants' stated intent, 2019 WL 13196604, *see* Doc. 15 at 2, the Court disqualifies Smith from acting as trial counsel for AMHA and from taking or defending depositions associated with this case. *See, e.g.*, *180 Indus., LLC v. Brunner Firm Co.*, 2019 WL 13196604, at *4 (S.D. Ohio).

Plaintiff's second ground for disqualification does not demand a different result. Plaintiff argues only that Smith's ability to "carry out an appropriate course of action for Defendants" will be materially limited by his "own personal interests" in the litigation. (Doc. 13, at 8). Initially, Defendants, not the Court, are best positioned to determine whether Smith is able to sufficiently advocate on their behalf. *See In re BellSouth Corp.*, 334 F.3d 941, 955 (11th Cir. 2003) (explaining "there is a constitutionally based right to counsel of choice" in civil cases that flows from the Fifth Amendment's due process guarantee). Further, Plaintiff fails to explain what "personal interests" Smith has at stake in this litigation. Smith is not a named defendant, nor does Plaintiff's Complaint allege Smith is personally responsible for a deprivation of Plaintiff's federal rights. Thus, there is no reason to believe Smith's own personal interests will impair his ability to act as a faithful agent

31

of Defendants, particularly given the Court's decision to bar him from participating in the above-stated trial proceedings.

CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Defendants' Motion to Dismiss (Doc. 7) be, and the same hereby is, GRANTED IN PART and DENIED IN PART as set forth herein. In sum, Plaintiff's second and third claims alleging violations of the due process clause of the Fourteenth Amendment and 42 U.S.C. § 1437d may proceed to the extent they seek relief from Director Wright in her personal capacity. It is

FURTHER ORDERED that Plaintiff's Motion to Disqualify (Doc. 13), be and the same hereby is, GRANTED IN PART as set forth herein.

_s/ James R. Knepp II_____
UNITED STATES DISTRICT JUDGE

Dated: October 1, 2025